## IN THE UNITED STATES DISTRICT COURT
## FOR THE DISTRICT OF MARYLAND

PNC BANK, N.A.,

     **Appellant - Defendant,**

     v.

TERESA DAVIS AND
CHRISTOPHER DAVIS,

     **Appellees - Plaintiffs.**

     \*

     \*       **CIVIL NO. JKB-21-01367**

     \*

     \*

\*   \*   \*   \*   \*   \*   \*   \*   \*   \*   \*   \*

## MEMORANDUM

This case comes before this Court from the United States Bankruptcy Court for the District of Maryland. It arises from an adversary proceeding filed by debtors Teresa and Christopher Davis against PNC Bank, N.A. ("PNC") relating to the enforceability of a mortgage loan modification. This Court previously determined that this was a non-core proceeding and, therefore, has construed the Bankruptcy Court's findings as proposed findings of fact and conclusions of law. (*See* ECF Nos. 13, 14.) For the reasons set forth below, the Court adopts the Bankruptcy Court's determination that PNC is liable for breach of contract and has violated Maryland consumer protection statutes. The Court further adopts the Bankruptcy Court's determination that PNC is liable for $50,000 in emotional distress damages. However, the Court finds that the Davises have not proven the compensatory damages allegedly associated with the breach of contract. Further, while the Court finds that an award of attorneys' fees is appropriate, the total reasonable amount of such fees and expenses is $134,572.82.

1

## I.     *Factual and Procedural Background[1]*

In short and as described in more detail below, the Davises have filed for bankruptcy twice and, during the second bankruptcy proceeding, filed an adversary proceeding against PNC regarding to enforce a mortgage modification agreement. The Bankruptcy Court recommended that PNC be found liable for breach of contract and concluded that PNC had violated two Maryland consumer protection statutes. The Bankruptcy Court also recommended contract damages and emotional distress damages, as well as an award of attorneys' fees and expenses. PNC has objected to several of the Bankruptcy Court's findings, which will be specified below.

In 2005, the Davises obtained mortgage financing from PNC. (Bankr. Ct. Findings of Fact and Conclusion of Law ("Bk. Findings") at 4–5, ECF No. 3-3.) Beginning in 2013, the Davises sought to modify their mortgage. (*Id.* at 11.) The process was lengthy, distressing, and frustrating for the Davises. (*Id.* at 11–12.) In January 2014, PNC informed the Davises that their mortgage had been referred to the foreclosure department. (*Id.* at 12 n.46.) In a letter dated October 23, 2014, PNC notified the Davises that their home was scheduled for foreclosure sale on November 10, 2014. (*Id.* at 13.) On November 4, 2014, the Davises filed their first voluntary Chapter 13 bankruptcy case. (*Id.*)

In June 2015, PNC offered the Davises a Trial Period Plan ("TPP"). (PNC Trial Ex. 14 at

---

[1]     As described in more detail below, the Court reviews the Bankruptcy Court's findings pursuant to Bankruptcy Rule 9033(d). The Court therefore focuses on PNC's specific objections and, because the Court—having carefully reviewed the record and finding no clear error—accepts and adopts the non-objected-to factual findings, the Court includes here certain of the Bankruptcy Court's factual findings, as well as facts the Court has identified through its review of the record. The Court reiterates this background and procedural history here as necessary to put the issues into context. Further, the Court notes that it has reviewed the record certified to this Court, including all trial exhibits and transcripts of hearings and of the two days of trial before the Bankruptcy Court. Further, the Court has reviewed recordings of the two days of trial and filings docketed in the Davises' main bankruptcy case and in the adversary proceeding.

DX014-003, ECF No. 4-2.[2]) The letter offering the TPP specified that the Davises were required to make trial payments for three months and that "[a]fter all trial period payments are made on time and you have submitted the required documents, and if you continue to qualify, your mortgage will be permanently modified." (*Id.*) The parties do not dispute that the Davises complied with the TPP.

In a letter dated October 21, 2015 ("Offer Letter"), PNC offered the Davises a permanent mortgage modification. (PNC Trial Ex. 17 at DX017-001–02.) The Offer Letter explains:

> **Congratulations!**   You are eligible for a Home Affordable Modification.   As previously described, if you comply with the terms of the Home Affordable Modification Trial Period Plan, we will modify your mortgage loan and waive all prior late charges that remain unpaid.
>
> The enclosed Home Affordable Modification Agreement ("Modification Agreement") reflects the proposed terms of your modified mortgage.
>
> **How to Accept This Offer:**
>
> **STEP 1: COMPLETE AND RETURN THE ENCLOSED AGREEMENT BY THE DUE DATE**
> To accept this offer, **you must sign and return both copies** of the Modification Agreement to us in the enclosed pre-paid envelope by **11/04/15**. If the Modification Agreement has notary provisions at the end, you must sign both copies before a notary public and return the notarized copies to us . . . . If you do not send both signed copies of the Modification Agreement by the above date, you must contact us if you still wish to be considered for this program and have your loan modified.
>
> **STEP 2: CONTINUE TO MAKE YOUR TRIAL PERIOD PAYMENTS ON TIME**
> Be certain to make any remaining trial period payments on or before the dates they are due. If the trial period payments are made after their due dates or in amounts different from the amount required, your loan may not be modified.
>
> To better understand the proposed terms of your modified mortgage, please read the attached summary of your modified mortgage and the Modification Agreement.

---

[2]    The Court notes that the parties' trial exhibits were filed in hard copy. (*See* ECF No. 4-1 (Davis Trial Ex. Binder); ECF No. 4-2 (PNC Trial Ex. Binder).) For ease of reference, the Court will refer to the exhibits by exhibit number in the binders provided.

(*Id.* at DX017-001.)

The Modification Agreement, which was included in the same package as the Offer Letter, includes the following language under Section 1 "My Representations and Covenants": "I have obtained all necessary approvals for acceptance of this Modification required by the Bankruptcy Court and the trustee appointed to my bankruptcy case." (*Id.* at DX017-004–05.)  It notes that "[t]his Agreement will not take effect unless the preconditions set forth in Section 2 have been satisfied." (*Id.* at DX017-004.)  Section 2 provides, under the heading "Acknowledgments and Preconditions to Modification," that:

> A. If prior to the Modification Effective Date as set forth in Section 3 [November 1, 2015] the Lender determines that any of my representations in Section 1 [which includes the bankruptcy court approval requirement] are no longer true and correct, or any covenant in Section 1 has not been performed, the Loan Documents will not be modified and this Agreement will terminate.  In that event, the Lender will have all of the rights and remedies provided by the Loan Documents; and
>
> B. I understand that the Loan Documents will not be modified unless and until (i) the Lender accepts this Agreement by signing and returning a copy of it to me, and (ii) the Modification Effective Date [November 1, 2015] has occurred.  I further understand and agree that the Lender will not be obligated or bound to make any modification of the Loan Documents if I fail to meet any one of the requirements under this Agreement.

(*Id.* at DX017-005.)  The Modification Agreement also explains that, after the borrower signs and returns the Modification Agreement, "the Lender will send [the Borrower] a signed copy of this Agreement." (*Id.* at DX017-004.)

The package PNC sent to the Davises includes references to a company called Title First. The Modification Agreement indicates, under the signature block for the Davises and PNC, that the Modification Agreement is to be sent to Title First after recording. (*Id.* at DX017-010 ("After Recording Return to: Title First Agency").)  A letter enclosed in the package explained that the

4

Davises could use Title First to notarize the Modification Agreement. (Davis Trial Ex. 17.) PNC provided a pre-paid FedEx return envelope. (Bk. Findings at 15.)

PNC also mailed copies of the Modification Agreement to the Davises' lawyer and to the bankruptcy trustee. (*See* PNC Trial Ex. 15; PNC Trial Ex. 16.) In those letters, PNC indicated that "PNC Mortgage must obtain a signed court order approving the modification by the bankruptcy court before we can officially approve and begin the modification process." (*Id.*)

As explained in more detail below, the parties disagree as to whether the Davises complied with the requirements set forth in these documents. The Davises contend that they signed, notarized, and mailed the documents via FedEx on October 31, 2015, while PNC argues that the Davises' testimony that they returned the documents as requested is not credible and that the record does not otherwise support the conclusion that the Davises returned the documents as instructed. (*See* PNC Br. at 11–12, ECF No. 18; Davis Br. at 9, ECF No. 23.)

PNC's internal Loss Mitigation Notes[3] indicate that the Davises called PNC on November 2, 2015 to explain that they had mailed back the documents and that they were planning to bring the first payment under the Modification Agreement to a PNC branch. (PNC Trial Ex. 22 at DX022-027.) The Davises made their first payment due under the Modification Agreement on November 6, 2015. (Davis Trial Ex. 6.) The Loss Mitigation Notes indicate that the Davises also called PNC on December 8, 2015 to ensure that PNC had received their payment and that the Davises had made all required TPP payments. (PNC Trial Ex. 22 at DX022-027.)

Further, on November 5, 2015, the Davises' attorney filed a motion seeking approval of the Modification Agreement. (PNC Trial Ex. 36.) There was a hearing scheduled for the approval

---

[3]     PNC's witness testified that PNC produced Customer Service Notes (PNC Trial Ex. 23) and Loss Mitigation Notes (PNC Trial Ex. 22), which are both internal PNC notes to track communications with customers and information regarding loans. (*See* July 30, 2019 Trial Tr. at 72:8–9, ECF No. 2-56.) PNC also maintains Bankruptcy Notes, but it does not appear that those were produced by PNC or otherwise presented at trial. (*Id.* at 52:9–24.)

of the motion on January 13, 2016. (PNC Trial Ex. 38.) The bankruptcy trustee objected to the Modification Agreement. (PNC Trial Ex. 40.) The Davises' attorney filed an amended motion on November 19, 2015. (PNC Trial Ex. 41.) The hearing remained scheduled for January 13, 2016. (Bk. Findings at 9.)

In a letter to the Davises dated December 22, 2015 ("Termination Letter"), PNC explained that it was "no longer considering [their] request for a modification" because "[a]fter being offered a Trial Period Plan or Home Affordable Modification [they] notified [PNC] on December 22, 2015 that [they] did not wish to accept the offer." (PNC Trial Ex. 20.) There is no evidence that the Davises contacted PNC to indicate that they no longer wanted the loan modification, and PNC's internal notes do not indicate that the Davises made any such contact. (*See generally* PNC Trial Exs. 22, 23.) The PNC Customer Service Notes indicate that PNC was operating under a December 21, 2015 deadline (i.e., 60 days from when PNC sent the Davises the Offer Letter) for bankruptcy court approval. (*See, e.g.*, PNC Trial Ex. 23 at DX023-18–19 ("Borrower has until 12/21 to get court approval").) These Customer Service Notes also indicate that PNC did not receive such approval for the modification by this date. (*Id.*) There is no evidence that the Davises were apprised of a 60-day deadline for bankruptcy court approval. The record reflects that the Davises thereafter began the modification process anew.

Before the Davises received the Termination Letter, the Modification Agreement (signed by the Davises and notarized, but not signed by PNC) was recorded in the Carroll County, Maryland land records on December 16, 2015. (PNC Trial Ex. 3.) PNC's Customer Service Notes indicate that PNC received the recorded Modification Agreement (i.e., the version that included the Davises' signature) on January 6, 2016. (PNC Trial Ex. 23 at DX023-17 (January 6, 2016 entry indicating that "MOD AGREEMENT REC'D BACK FROM COUNTY RECORDER").)

The parties disagree on the factual circumstances surrounding the recordation. (*See* PNC Br. at 12 (suggesting that the Davises or one of their representatives sent the document directly to Title First and explaining that it is clear that PNC did not provide the document to Title First for recordation); Davis Br. at 11–12 (explaining that the recorded modification includes handwritten notes that were not made by the Davises and that were not present in the copy received by the Davises, and that these notations must have been made by someone affiliated with PNC).)

The Davises eventually sought dismissal of the first bankruptcy case prior to any hearing on (or approval of) the Modification Agreement, and the case was dismissed in March 2016. (Bk. Findings at 10.) On March 16, 2016, PNC sent the Davises a letter and mortgage statement based on the original loan terms requiring them to pay current and past due amounts on the mortgage. (Davis Trial Exs. 8, 9.) The letter indicated that $41,975.03 was due on the mortgage, and that "[f]ailure to bring your loan current may result in fees and foreclosure – the loss of your home. As of the date of this letter, your loan is 746 days delinquent. Your loan has been delinquent as of March 01, 2014." (Davis Trial Ex. 9.) The letter further notes that "[c]urrently there is $7,636.21 in Corporate Advance fees that are not reflected in the amounts owed." (*Id.*) The mortgage statement indicated different amounts due, noting that the past due amount on the mortgage was $48,353.30 and that the total amount due was $51,372.48. (Davis Trial Ex. 8.) PNC scheduled a foreclosure sale for April 25, 2016. (Davis Trial Ex. 48 at 5.)

On April 22, 2016, the Davises filed a second voluntary Chapter 13 petition. (Bk. Findings at 6.) As is relevant here, during the course of the second bankruptcy case, on January 25, 2017, PNC filed a Motion Seeking Relief from Stay to allow it to move forward with foreclosure, noting that "[a] Loan Modification Agreement was completed and executed by the parties herein. A copy of the loan modification is attached hereto as Exhibit D." (*Id.*) The motion attached the

7

Modification Agreement that had been recorded in the Carroll County land records. (*Id.*) In response, the Davises described the events surrounding the Modification Agreement and PNC's withdrawal of the Agreement. (*Id.*) On January 9, 2018, PNC filed an amendment removing the Modification Agreement from the Motion Seeking Relief from Stay, noting that the Modification Agreement was invalid. (*Id.*) The Davises opposed this motion. (*Id.* at 6–7.) PNC described the attachment of the Modification Agreement to the Motion Seeking Relief from Stay as an error. (*See* PNC Br. at 19 n.12 (noting that it had received the document in July 2017 when the Davises' attorney had forwarded it to PNC).) The Davises argue that PNC's representation that this was an inadvertent mistake on the part of PNC's lawyer is not credible, and note that the Modification Agreement was not removed from the motion for nearly a year. (Davis Br. at 16–17.)

The Davises filed the Complaint at issue here against PNC on July 24, 2017 seeking declaratory and equitable relief. (Compl., ECF No. 2-3.) In their May 31, 2018 Amended Complaint, the Davises included counts for breach of contract, violations of the Maryland Consumer Debt Collection Act ("MCDCA"), violations of the Maryland Consumer Protection Act ("MCPA"), and equitable relief, including sanctions in an amount to bring the Davises current on their mortgage payments and to cure related tax liabilities. (Am. Compl., ECF No. 2-15.)

The Bankruptcy Court conducted a two-day trial on the merits and heard testimony from the Davises and Dorothy Thomas, a PNC designee. (Bk. Findings at 2.) The Bankruptcy Court thereafter recommended that PNC be found liable for breach of contract and to have violated the MCDCA and MCPA. (*See id.* at 26–38.) Further, the Bankruptcy Court found that the Davises should be awarded $22,230 in contract damages (comprised of $4,935 for filing and attorneys' fees for their second Chapter 13 case, $12,295 for their time off work, and $5,000 in general damages) and $50,000 in emotional distress damages in connection with the MCDCA violation.

8

(*Id.* at 21–25.) The MCPA allows for attorneys' fees and, therefore, after a petition for attorneys' fees and additional briefing, the Bankruptcy Court recommended that the Davises be awarded $302,472.67 in attorneys' fees. (ECF No. 3-30.)

PNC has objected to the Bankruptcy Court's findings, posed as the following questions:

1. Since the factual record demonstrates that PNC revoked the loan modification because the Davises had not satisfied multiple conditions precedent, should the district court conclude that the parties did not enter into a valid and enforceable contract for a loan modification?

2. Since the Davises did not experience any monetary loss proximately caused by a breach by PNC of the alleged contract for a loan modification, should the district court conclude that the Davises did not carry their burden of proving the existence of cognizable contract damages, whether in the amount of $22,230.00 or any other amount?

3. Since the record contains no evidence that PNC at any time acted with actual knowledge that the debt it sought to enforce was somehow invalid, should the district court conclude that PNC did not violate the MCDCA?

4. Since the record contains no evidence that either ties PNC's conduct to emotional distress experienced by the Davises or substantiates any emotional distress beyond the Davises' conclusory testimony, should the district court conclude that the Davises failed to establish a basis for recoverable emotional distress damages?

5. Since the record indicates that PNC should prevail on the MCDCA claim, and since the record contains no evidence that the Davises sustained a compensable injury proximately caused by a prohibited trade practice of PNC, should the district court conclude that the Davises failed to establish a violation of the MCPA?

6. Since the record contains neither legal nor factual support for an award to the Davises of attorneys' fees and costs, should the district court conclude that the Davises failed to establish a basis for a fee award?

(PNC Br. at 2–3.)[4]

---

[4]     The Davises also present issues, although they are not styled as objections. However, the Davises' questions largely present the inverse questions PNC presents or otherwise do not affect the outcome of this matter, the Court has not separately listed them here.

## II.    *Standard of Review*

The Court previously determined that this was a non-core proceeding. (*See* ECF Nos. 13,

14.) Accordingly, pursuant to Federal Rule of Bankruptcy Procedure 9033(d), this Court's task is

to "make a de novo review upon the record or, after additional evidence, of any portion of the

bankruptcy judge's findings of fact or conclusions of law to which specific written objection has

been made in accordance with this rule." Under that Rule, the Court "may accept, reject, or modify

the proposed findings of fact or conclusions of law, receive further evidence, or recommit the

matter to the bankruptcy judge with instructions." *See also* 28 U.S.C. § 157(c)(1) ("In [a non-core

but related proceeding], the bankruptcy judge shall submit proposed findings of fact and

conclusions of law to the district court, and any final order or judgment shall be entered by the

district judge after considering the bankruptcy judge's proposed findings and conclusions and after

reviewing de novo those matters to which any party has timely and specifically objected.").

Further, absent specific objections, the Court reviews the Bankruptcy Court's

recommendations for clear error. As stated in the Advisory Committee Notes, Federal Rule of

Bankruptcy Procedure 9033(d) "adopts the de novo review provisions of Rule 72(b) F.R.Civ.P"

applicable to review of reports and recommendations by magistrate judges. As the Fourth Circuit

has explained with respect to Federal Rule of Civil Procedure 72(b), "in the absence of a timely

filed objection, a district court need not conduct a de novo review, but instead must 'only satisfy

itself that there is no clear error on the face of the record in order to accept the recommendation.'"

*Diamond v. Colonial Life & Acc. Ins. Co.*, 416 F.3d 310, 315 (4th Cir. 2005) (citing Fed. R. Civ.

P. 72 advisory committee's note).

10

### III.   *Analysis*

### A. *Breach of Contract*

PNC's first objection is: "Since the factual record demonstrates that PNC revoked the loan modification because the Davises had not satisfied multiple conditions precedent, should the district court conclude that the parties did not enter into a valid and enforceable contract for a loan modification?" (PNC Br. at 2.)  In particular, PNC argues that the Davises (1) did not properly execute and return the modification; (2) did not timely obtain bankruptcy court approval of the modification; and (3) did not obtain PNC's countersignature.  (PNC Reply at 4, ECF No. 24.) Thus, PNC argues, no contract was formed and there was no breach of contract.  (PNC Br. at 31– 38.)  As described in more detail below, upon a *de novo* review of the record and the law, the Court concludes that the Davises accepted PNC's offer to modify their mortgage and PNC breached that agreement.

Under Maryland law, "an enforceable contract is formed where one party makes an offer and the other party accepts before the offer is revoked." *Fedder Dev. Corp. v. FB Hagerstown, LLC*, 181 F. App'x 384, 390 (4th Cir. 2006) (citing *Prince George's Cnty. v. Silverman*, 472 A.2d 104, 112 (Md. Ct. Spec. App. 1984)).  In interpreting a contract, a court must "determine from the language of the agreement itself what a reasonable person in the position of the parties would have meant at the time it was effectuated." *Dumbarton Imp. Ass'n, Inc. v. Druid Ridge Cemetery Co.*, 73 A.3d 224, 232 (Md. 2013) (internal citations and quotations omitted).  Maryland law recognizes two forms of conditions precedent, those precedent to formation and those precedent to performance. *See Brown v. Allied Home Mortg. Capital Corp.*, Civ. No. JKB-11-667, 2011 WL 3351532, at *2 (D. Md. Aug. 2, 2011).  With the former, there is "a condition precedent to the contract's formation[, in] the absence of [which] there was no binding contract." *Id.*  With the

11

latter, a contract is formed, but "no duty of performance arises until the condition precedent is either performed or excused." *Id.*

As explained above, the Offer Letter—which explicitly identifies itself as an offer—includes only two requirements. (PNC Trial Ex. 17 at DX017-001.) The Offer Letter provides instructions on "How to Accept This Offer" and lays out two steps: (1) "complete and return the enclosed agreement by the due date," which was November 4, 2015, and (2) "continue to make your trial period payments on time." (*Id.*) These two requirements are in a larger font than the rest of the letter, and are capitalized and in bold. (*Id.*) The Offer Letter does not indicate that there may be additional steps the Davises needed to take to accept PNC's offer, but rather notes: "[t]o better understand *the proposed terms of your modified mortgage*, please read the attached summary of your modified mortgage and the Modification Agreement." (*Id.* (emphasis added).) It also includes the following language: "Congratulations! You are eligible for a Home Affordable Modification. As previously described, if you comply with the terms of the Home Affordable Modification Trial Period Plan,[5] *we will modify your mortgage loan* and waive all prior late charges that remain unpaid." (*Id.* (emphasis added).)

The Modification Agreement itself includes the following under Section 1 "Representations and Covenants": "I have obtained all necessary approvals for acceptance of this Modification required by the Bankruptcy Court and the trustee appointed to my bankruptcy case." (*Id.* at DX017-004–05.) It also notes that "[t]his Agreement will not take effect unless the preconditions set forth in Section 2 have been satisfied." (*Id.* at DX017-004.) Section 2 provides certain "Acknowledgments and Preconditions to Modification[,]" which provide that the

---

[5]   The parties do not dispute that the Davises complied with the terms of the TPP, and the record supports a finding that they did indeed comply.

12

Modification Agreement "will terminate" if any representations are no longer true and correct and that the loan documents will not be modified until PNC signs and returns the Modification Agreement and November 1, 2015 has passed. (*Id.* at DX017-005.) The Modification Agreement also notes that, once the borrowers return the signed Modification Agreement, "the Lender *will send me* a signed copy of this Agreement." (*Id.* at DX017-004 (emphasis added).)

### 1.   Return of the Signed Documents

The requirement that the Davises sign and return copies of the modification agreement was a condition precedent to contract formation. (*See* PNC Trial Ex. 17 at DX017-001 ("To accept this offer, you must sign and return both copies of the Modification Agreement to us in the enclosed, pre-paid envelope by 11/04/15." PNC argues that this condition was not satisfied because the record shows that "PNC never received the Federal Express envelope containing the executed Modifications" and because the Davises' testimony that they returned the envelope is not credible. (PNC Br. at 10–13.) The Davises argue that they did sign and return the documents, and also testified to this fact at trial. (Davis Br. at 9–11, 32).

On a *de novo* review of the record, the Court finds that the Davises executed and returned the documents as required by the Offer Letter. At the outset, the Court notes that the requirement was for the Davises to *return* the documents by November 4, 2015, not for PNC to *receive* the documents by that date. (*See* PNC Trial Ex. 17 at DX017-001 ("To accept this offer, you must *sign and return* both copies of the Modification Agreement . . . by 11/04/15") (emphasis added).) The Davises testified that they had returned the envelope as directed by PNC on October 31, 2015. Both Christopher and Teresa Davis testified to this point credibly and in great detail. (July 29, 2019 Trial Tr. 62–65 (Teresa Davis describing signing, notarizing, and dropping the package off in a FedEx box after attempting to return it at a post office); *id.* at 172–74 (Christopher Davis

13

explaining that they first went to the postal service but found out they could not mail the package from there and found a FedEx box to drop off the documents).)[6]  Further, their testimony is corroborated by contemporaneous PNC records, which indicate that Teresa Davis called PNC on November 2, 2015—prior to the November 4, 2015 deadline—to explain that she had already mailed the signed modification. (*See* PNC Ex. 22 at DX022-027 (indicating that on November 2, 2015, the Davises called and "STATED ALREADY MAILED DOCS" and "STATED WILL TAKE 1ST PMT TO PNC BRANCH").)  Further, the Offer Letter specified that "[i]f you do not send both signed copies of the Modification Agreement by [November 4, 2015], you must contact us if you still wish to be considered for this program and have your loan modified." (PNC Trial Ex. 17 at DX017-001.) The Davises unquestionably complied with this requirement when Teresa Davis called on November 2, 2015.

Given that the Davises had, at this point, spent over two years trying to get a loan modification and testified about the time and effort expended and distress this process caused (*see, e.g.*, July 29, 2019 Trial Tr. at 41–42), it strains belief that they would not have complied with the relatively simple step of signing and sending the documents. In addition, the Termination Letter is dated December 22, 2015, nearly two months after the November 4, 2015 deadline for returning the signed documents. This timing further suggests that the Davises satisfactorily complied with the requirement to sign and return the documents, as PNC did not notify the Davises after the

---

[6]     PNC, in its briefing and during trial, sought to discredit the Davises and their credibility.  The Court, upon a *de novo* review of the record, including review of the audio of the July 29 and July 30, 2019 and the record certified to this Court, finds that the Davises were credible witnesses. *See United States v. Perry*, Crim. No. 18-113, 2019 WL 2189514, at *2 (E.D. Va. May 21, 2019) (explaining that "[w]here a party objects to a magistrate judge's credibility determinations, the district court must conduct a de novo credibility determination, but the court need not 'rehear the contested testimony' in order to make its credibility determination. Rather, the district court may consider the record developed by the Magistrate Judge to make a de novo determination on the credibility of witnesses." (citing *United States v. Raddatz*, 447 U.S. 667, 674, 676–77 (1980)).  As noted above, Federal Rule of Bankruptcy Procedure 9033(d) is based on the review standard applicable to magistrate decisions.

deadline that it had not received the documents.[7]

The Court has considered the evidence tending to suggest that the Davises did not return the documents as instructed, including the absence of the tracking number from the FedEx records (PNC Trial Ex. 24) and the absence of an entry in PNC's internal notes that it had received the documents (prior to January 6, 2016, when it received the recorded document). (*See* PNC Trial Ex. 22 at DX022-027–28; PNC Trial Ex. 23 at DX023-018–19). While the Court appreciates that this evidence may undercut the assertion that the Davises returned the documents as requested in the Offer Letter, on the totality of the record, the Court finds that the Davises have proven by a preponderance of the evidence that they returned the documents. *See Cipriano Square Plaza Corp. v. Munawar*, No. 1871, 2018 WL 1040020, at *2 n.2 (Md. Ct. Spec. App. Feb. 21, 2018) ("Parties must prove a breach of contract by a preponderance of the evidence.").

### 2. Additional Conditions Precedent: Bankruptcy Court Approval and PNC Countersignature

As noted above, PNC argues that the Modification Agreement included additional steps, including bankruptcy court approval and PNC countersignature, that were also conditions precedent to formation of the contract. In particular, PNC argues that it had the right to revoke the offer because the Davises had not yet obtained timely bankruptcy court approval and PNC countersignature when PNC sent the Termination Letter. (PNC Br. at 13–15, 33.) The Davises argue that there were no conditions precedent to formation other than the two specified in the Offer Letter. (Davis Br. at 32.) On a *de novo* review of the record and the law, the Court concludes that such requirements were not conditions precedent to formation of a contract.

---

[7]    Moreover, PNC unquestionably knew that the Davises were intending to pursue the modification on November 5, 2015, when the Davises filed a motion with the Bankruptcy Court for approval of the Modification Agreement; PNC also was in receipt of the signed Modification Agreement no later than November 19, 2015, when the Davises filed a copy of the signed agreement with the Bankruptcy Court, and again on January 6, 2016, when PNC received the recorded Modification Agreement from the Carroll County land records.

15

Generally, under Maryland law:

> A contract is formed when an unrevoked offer made by one person is accepted by another. An offer is the manifestation of willingness to enter into a bargain, so made as to justify another person in understanding that his assent to that bargain is invited and will conclude it. A manifestation of willingness to enter into a bargain is not an offer if the person to whom it is addressed knows that the person making it does not intend to conclude a bargain until he has made a further manifestation of consent.

*Silverman*, 472 A.2d at 112 (internal quotations and citations omitted). Contract formation can be limited by "language [that] create[s] a condition precedent to the contract's formation." *Brown*, 2011 WL 3351532, at *2. "The determination of whether a provision in a contract constitutes a condition precedent is a question of 'construction dependent on the intent of the parties to be gathered from the words they have employed and, in case of ambiguity, after resort to the other permissible aids to interpretation.'" *N.Y. Bronze Powder Co., Inc. v. Benjamin Acquisition Corp.*, 716 A.2d 230, 233 n.2 (Md. 1998) (quoting *Chirichella v. Erwin*, 310 A.2d 555, 557 (Md. 1973).

The Offer Letter unambiguously only requires that the Davises (1) "complete and return the enclosed agreement by [November 4, 2015]" and (2) "continue to make [ ] trial period payments on time." (PNC Trial Ex. 17 at DX017-001.) The Offer Letter does not specify any additional conditions precedent to formation; indeed, it does not even suggest that there may be additional conditions precedent to formation contained in the Modification Agreement. (*See id.* ("To *better understand the proposed terms of your modified mortgage*, please read the attached summary of your modified mortgage and the Modification Agreement.") (emphasis added).) The requirements in the Modification Agreement itself—bankruptcy court approval and PNC's countersignature—were not conditions precedent to formation. A contract was therefore formed when the Davises complied with the two steps contained in the Offer Letter.

### a. Bankruptcy Court Approval

With respect to bankruptcy court approval, the Modification Agreement explains that if

PNC "determines that any of my representations in Section 1 are no longer true and correct, or any covenant in Section 1 has not been performed, *the Loan Documents will not be modified and this Agreement will terminate.*" (PNC Trial Ex. 17 at DX017-005 (emphasis added).) The plain language of this provision assumes the existence of a contract by indicating that a failure to obtain bankruptcy court approval could result in the *termination* of said contract. Thus, while the Davises were required to obtain bankruptcy court approval for PNC to finalize the modification process, the Davises were not required to obtain bankruptcy court approval to accept PNC's offer. The parties do not dispute—and the record reflects—that the Davises were in the process of obtaining such approval when PNC purported to revoke its offer based on an undisclosed 60-day deadline for obtaining approval.[8] Indeed, as noted above, there was a hearing scheduled for January 13, 2016 when PNC sent its December 22, 2015 Termination Letter.[9]

The Court's conclusion that bankruptcy court approval could not have been condition precedent to contract formation is bolstered by several additional facts. First, it would have been nearly impossible for the Davises to obtain bankruptcy court approval by November 4, 2015, when

---

[8]    PNC's witness, Dorothy Thomas, testified that no one attempted to contact the Davises to notify them that PNC had not received the documents, despite receiving the November 2, 2015 call from the Davises and receiving at least one payment under the modification. (*See, e.g.,* July 29, 2019 Trial Tr. at 235.) Given the Davises' clear indications of interest, such as through the November 2, 2015 phone and their filing of a motion attaching the Modification Agreement with the bankruptcy court on November 19, 2015, Thomas's testimony that PNC would have allowed the Davises additional time to get bankruptcy court approval if PNC knew that they were interested in the modification is simply not credible. (*See id.* at 241:4–8 ("If we had received the signed modification back, like we told them to do, then we would've had a more -- closer understanding that they were serious about wanting to move forward with this loan modification . . . [S]ince we didn't even have the signed loan modification in our possession, we had never received it back from the borrower, it gave the impression that they were not interested in the loan modification.").)

[9]    Further, PNC, by the terms it included in the Modification Agreement, only had until November 1, 2015 to terminate the Modification Agreement on the basis that the Davises did not comply with the requirement to obtain bankruptcy court approval, and it did not do so. (*See* PNC Trial Ex. 17 at DX017-005 (providing that "[i]f prior to the Modification Effective Date as set forth in Section 3 [November 1, 2015] the Lender determines that any of my representations in Section 1 [which includes the bankruptcy court approval requirement] are no longer true and correct, or any covenant in Section 1 has not been performed, the Loan Documents will not be modified and this Agreement will terminate.").) The record does not reflect—and indeed PNC does not argue—that it provided any such notice by November 1, 2015.

17

the Davises did not receive the letter until after October 21, 2015. The Davises would have been required to file the modification with the Bankruptcy Court, and await any objections and a decision from the Court. It is unlikely that this would have occurred in the two-week window that PNC provided.

Second, PNC sent a letter to the Davises' counsel regarding the Modification Agreement, in which PNC indicated that "PNC Mortgage must obtain a signed court order approving the modification by the bankruptcy court before we can *officially approve and begin the modification process*." (PNC Trial Ex. 15 (emphasis added).)   The letter provided that PNC must be notified when the motion requesting bankruptcy court approval was filed, of the date of any hearing on the motion, and of the bankruptcy court's decision. (*Id.*) Notably, nothing in this letter indicates that the Davises must obtain bankruptcy court approval to accept PNC's offer. Rather, this letter simply explained that PNC would not officially begin the modification process before this had been done.

Third, a letter to Ellen Cosby, the bankruptcy trustee, included similar language, indicating that "PNC Mortgage must obtain a signed court order approving the modification by the bankruptcy court before we can *officially approve and begin the modification process*" and requesting that she "refer to the modification included in this mailing for specific deadlines to assist our borrower." (PNC Ex. 16 (emphasis added).) For the same reasons, this letter also suggests that bankruptcy court approval was not a condition precedent to contract formation.

### b. PNC Countersignature

PNC's countersignature was also not a condition precedent to formation of the contract. *See Galante v. Ocwen Loan Servicing LLC*, Civ. No. ELH-13-1939, 2014 WL 3616354, at *16 (D. Md. July 18, 2014) (explaining that "some acts provided for in a contract may not qualify as a

18

condition precedent, and instead may simply serve to memorialize the agreement between the parties"). Here, the Modification Agreement indicates that PNC is required to sign the Modification Agreement if the Davises sign and return it: "I understand that after I sign and return two copies of this Agreement to the Lender, the Lender *will send me a signed copy of this Agreement.*" (PNC Trial Ex. 17 at DX017-004 (emphasis added).) This requirement speaks to the memorialization of the agreement, rather than a condition precedent. *See Galante*, 2014 WL 3616354, at *16 (denying a motion to dismiss and explaining that "a cover sheet sent by the lender to the plaintiff could be interpreted as evidence that the purported condition precedent found in the agreement—in that case, the presence of a signature—was in fact merely a means of memorializing an agreement that had already come into effect" (citing *Azimirad v. HSBC Mortg. Corp.*, Civ. No. DKC 10-2853, 2011 WL 1375970, at *4 n.3)).

A different reading would allow PNC to simply refuse to sign the agreement for any reason, even if the Davises had satisfied all requirements set forth in the Offer Letter and Modification Agreement. This reading is plainly not supported by the language in the Modification Agreement, which indicates that PNC will send a signed copy after receipt of the copies from the Davises. (PNC Trial Ex. 17 at DX017-004.) This language obligates PNC to send the Davises a signed copy of the Agreement. The Modification Agreement also specifies that PNC "will not be obligated or bound to make any modification of the Loan Documents if I fail to meet any one of the requirements under this Agreement." (*Id.* at DX017-005.) This language implies that, if the Davises meet the requirements set forth by PNC, PNC is obligated to modify the loan documents. (*See also id.* at DX017-004 (emphasis added) ("[I]f my representations and covenants in Section 1 continue to be true in all material respects, then this [Modification Agreement] *will . . . amend and supplement*" the mortgage and note secured by the mortgage).)

19

Further, to the extent that it is ambiguous whether bankruptcy court approval and PNC's countersignature were conditions precedent to formation, this ambiguity is to be resolved against PNC. *See Nationstar Mortg. LLC v. Kemp*, 258 A.3d 296, 319 n.52 (Md. 2021) ("If there were any ambiguity in how the provisions in the deed of trust or the loan modification agreement should be construed, under ordinary contract principles, they would be construed against the drafters – in this case, [the mortgage originator and servicer]."). PNC chose to include only two requirements for acceptance in its Offer Letter, and these requirements were listed in bold, capitalized, and in larger font than the rest of the document. If PNC wished to impose additional requirements for acceptance on the Davises, it could have easily done so.

Having found that the Davises validly accepted the Modification Agreement, the Court concludes that PNC breached this contract when it sent the Termination Letter and when it attempted to collect past due amounts based on the original mortgage.

### B. Contract Damages

PNC's second objection is: "Since the Davises did not experience any monetary loss proximately caused by a breach by PNC of the alleged contract for a loan modification, should the district court conclude that the Davises did not carry their burden of proving the existence of cognizable contract damages, whether in the amount of $22,230.00 or any other amount?" (PNC Br. at 2.) The Davises do not respond to this argument in their briefing. The Bankruptcy Court awarded the Davises the following damages: $4,935.00 filing and attorney's fees for the Davises Chapter 13 case; $12,295.00 for time off work; and $5,000 for general damages. Upon a *de novo* review of the law and the record, the Court finds that the Davises have not met their burden of proving these damages.

In general, under Maryland law, "[i]n a breach of contract action, upon proof of liability,

20

the non-breaching party may recover damages for 1) the losses proximately caused by the breach, 2) that were reasonably foreseeable, and 3) that have been proven with reasonable certainty." *Hoang v. Hewitt Ave. Assocs., LLC*, 936 A.2d 915, 934 (Md. Ct. Spec. App. 2007). "[T]he damages for a breach of contract should be such as may fairly and reasonably be considered, either as arising naturally, i.e. according to the usual course of things from such breach of the contract itself [referred to as general damages]; or such as may reasonably be supposed to have been in contemplation of both parties, at the time they made the contract, as the probable result of the breach of it [referred to as special damages or consequential damages]." *Burson v. Simard*, 35 A.3d 1154, 1159 (Md. 2012) (internal quotations and citations omitted). "[C]ourts may award 'incidental damages' as well." *Id.* (citations omitted).

Legal fees are generally not recoverable as damages in connection with a breach of contract claim. *St. Luke Evangelical Lutheran Church, Inc. v. Smith*, 568 A.2d 35, 38 (Md. 1990). However, "Maryland courts recognize that attorneys' fees are recoverable as actual damages in certain circumstances, namely 'where the wrongful acts of the defendant [have] involved the plaintiff in litigation with others, or placed him in such relation with others as make it necessary to incur expense to protect his interest.'" *Hauk v. LVNV Funding, LLC*, 749 F. Supp. 2d 358, 369 (D. Md. 2010) (quoting *Montgomery Village Assoc. v. Mark*, 620 A.2d 975, 979 (Md. Ct. Spec. App. 1993)).

The record does not support an award of fees and costs associated with the second bankruptcy case as damages for PNC's breach of contract. When asked why the Davises filed for bankruptcy in April 2016, Teresa Davis testified as follows on direct examination: "So the second mortgage [which was not the PNC mortgage] that was stripped in our first bankruptcy case wasn't filed properly by the prior attorney. There were some issues with that case. And to make sure that

everything was filed properly, it was agreed between my current attorney . . . that we should start that process over." (July 29, 2019 Trial Tr. 76:21–77:1.) She also testified in response to a similar question that: "Well, at that point, as far as, you know, being behind in payments, we couldn't catch up at that point. And as far as, you know, the second mortgage not being found, stripped properly, and there were just lots of mistakes in the first case." (*Id.* at 82:2–6.) This testimony reflects that the breach of contract on PNC's part was not the reason for the Davises' second bankruptcy. The record therefore also does not support a breach of contract damages award for the time the Davises spent taking off work to attend to their bankruptcy case or this litigation. The Davises have not met their burden of proving these damages.

Further, the $5,000 in general damages was proposed for the time and inconvenience—beyond the number of days the Davises took off work to attend to the bankruptcy-related litigation—resulting from the disruption of the Davises' lives. General damages under Maryland law are those that arise naturally from the breach of the contract itself. *Burson*, 35 A.3d at 1159. The Davises have also not met their burden of proving these damages with any certainty or that any such damages arose from the breach of contract.

Although the Court finds that the record does not support the above-described damages, the Court concludes that the Bankruptcy Court's finding—to which PNC has not objected—that "the Davises are entitled to cure any default and reinstate the mortgage loan on the terms of the Modification Agreement" appropriately puts the Davises in the position they would have been had the Modification Agreement been honored.[10] *See Beard v. S/E Joint Venture*, 581 A.2d 1275, 1278

---

[10] The Bankruptcy Court directed PNC "to file an accounting of all amounts necessary to reinstate the loan under the terms of the Modification Agreement without penalties, late charges, attorney's fees or other collection costs incurred after December 22, 2015." (Bk. Findings at 38–39.) As is relevant here, PNC provided such accounting, (ECF No. 3-19), and the Bankruptcy Court explained that "[a]t the May 4, 2021 hearing, the parties advised the Court that they agree that PNC" provided the necessary accounting and that "[a]ccordingly, no further order is necessary or required on that issue prior to entry of judgment against PNC." (ECF No. 3-30 at 2 n.2.)

(Md. 1990) ("Damages for breach of a contract ordinarily are that sum which would place the plaintiff in as good a position as that in which the plaintiff would have been, had the contract been performed.").

### C. MCDCA

PNC's third objection is: "Since the record contains no evidence that PNC at any time acted with actual knowledge that the debt it sought to enforce was somehow invalid, should the district court conclude that PNC did not violate the MCDCA?" (PNC Br. at 2–3.) The Bankruptcy Court found that PNC's collection attempts in March 2016 violated the MCDCA, finding that PNC acted knowingly or recklessly. (Bk. Findings at 32–36.) The Bankruptcy Court further found that PNC's liability under the MCDCA arose as of the date of the December 2015 Termination Letter.[11] (Id. at 35 n.114.) PNC argues that the record reflects that it did not act knowingly or recklessly when it sent the Davises the March 2016 mortgage statement. (PNC Br. at 43–44.) The Court finds, upon a *de novo* review, that PNC violated the MCDCA when it sent the Davises letters in December 2015 and March 2016.

Under the MCDCA, a debt collector may not: "[c]laim, attempt, or threaten to enforce a right with knowledge that the right does not exist." Md. Code Ann., Com. Law § 14-202(8). The knowledge required is "actual knowledge or [ ] reckless disregard as to the falsity of the existence of the right." *Chavis v. Blibaum & Assocs., P.A.*, 264 A.3d 1254, 1271 (Md. 2021) (internal quotations omitted) (citing *Fontell v. Hassett*, 870 F. Supp. 2d 395, 407 (D. Md. 2012)).

"[W]hether a defendant acted recklessly is a question of fact" that "will depend on all the facts the parties enter in evidence." *Id.* at 1274. Therefore, "to prevail at a stage of the case that

---

[11] PNC does not appear to specifically object to this finding, but rather focuses its objection on the finding that the March 2016 communications violated the MCDCA. (*See* PNC Br. at 2–3, 14.) However, the Court has also reviewed findings relating to the December 2015 letter *de novo*.

tests the evidence . . . the plaintiff must produce facts from which the trier of fact reasonably may infer that the defendant acted recklessly in claiming the right." *Simmons v. Maryland Mgmt. Co.*, 269 A.3d 369, 684 (Md. Ct. Spec. App. 2022) (citing *Chavis*, 264 A.3d at 1254), *cert. denied,* 276 A.3d 615 (Md. 2022). Further, as the Fourth Circuit recently explained:

> The MCDCA and the MCPA are [ ] remedial consumer protection statutes. As such, they "must be liberally construed, in order to effectuate [their] broad remedial purpose." *Andrews & Lawrence Pro. Servs., LLC v. Mills*, 223 A.3d 947, 968 (Md. 2020) (quoting *Lockett v. Blue Ocean Bristol, LLC*, 132 A. 3d 257, 272 (Md. 2016)); *see also Wash. Home Remodelers, Inc. v. State*, 45 A.3d 208, 219 (Md. 2012) (The MCPA "constitutes remedial legislation that is intended to be construed liberally in order to promote its purpose of providing a modicum of protection for the State's consumers."). In fact, Maryland's high court has expressly warned against construing these statutes in a "narrow or grudging" manner so as to "exemplify and perpetuate the very evils to be remedied." *Mills*, 223 A.3d at 968 (quoting *Pak v. Hoang*, 835 A.2d 1185, 1191 (Md. 2003)).

*Alexander v. Carrington Mortg. Servs., LLC*, 23 F.4th 370, 374 (4th Cir. 2022).

The Court finds that the December 2015 and March 2016 letters violated the MCDCA. The December 2015 letter indicated that "[a]fter being offered a Trial Period Plan or Home Affordable Modification you notified us on December 22, 2015 that you did not wish to accept the offer." (PNC Trial Ex. 20.) It further indicated that "normal servicing of your referenced loan will continue, including collection and foreclosure activity . . . If foreclosure activity was previously suspended, it may now resume." (*Id.*) The March 2016 mortgage statement indicated that the total amount due to PNC was $51,372.48. (Davis Trial Ex. 8.) The March 2016 letter indicated that the total amount due was $41,975.03 and that "[f]ailure to bring your loan current may result in fees and foreclosure – the loss of your home." (Davis Trial Ex. 9.) It further stated that "[f]irst legal foreclosure action has been taken." (*Id.*)

Through these communications, PNC "[c]laim[ed], attempt[ed], or threaten[ed] to enforce a right" that "does not exist," as is required to establish a violation of the MCDCA. *See, e.g., Est.*

24

*of Morgan v. BWW L. Grp.*, LLC, Civ. No. CBD-18-170, 2019 WL 2869286, at *2 (D. Md. July 3, 2019) (denying a motion to dismiss a MCDCA claim where a letter from a lender indicated that a foreclosure sale "may" occur); *Chavis*, 264 A.3d at 1269 (citations omitted) ("[T]he remedial nature of the MCDCA requires that we interpret § 14-202(8) broadly to reach any claim, attempt, or threat to enforce a right that a debt collector knows does not exist. Thus, we hold that a plaintiff may invoke § 14-202(8) when the amount claimed by the debt collector includes sums that the debt collector, to its knowledge, does not have the right to collect."). PNC had no right to resume foreclosure activity or to demand full payment from the Davises, as the Modification Agreement would have brought the Davises current on their mortgage.

Further, as is also required by § 14-202(8), PNC acted with the requisite "knowledge that the right does not exist." At a minimum, PNC acted recklessly in sending these letters when (1) PNC's internal notes indicated that the Davises had mailed the signed Modification Agreement; (2) the signed Modification Agreement was attached to a Bankruptcy Court filing at the time that PNC mailed the Termination Letter; and (3) by the time PNC sent the March 2016 communications, that the Modification Agreement had been recorded in the Carroll County land records and PNC had received a copy.

The potential existence of some confusion on the part of PNC regarding whether the Modification Agreement was operative does not negate its knowledge. *Kemp*, 258 A.3d at 321 (disagreeing that "the existence of a 'potentially meritorious' argument as to the existence of the right necessarily negates knowledge"); *Spencer v. Hendersen-Webb, Inc.*, 81 F. Supp. 2d 582, 594–95 (D. Md. 1999) ("Considering the remedial aim of the MCDCA and the dilution of the statute that would result from a contrary interpretation, the Court holds that the term 'knowledge' in the Act does not immunize debt collectors from liability for mistakes of law. This interpretation bears

25

in mind the age-old maxim that ignorance of the law will not excuse its violation. Moreover, in the context of consumer protection, it does not seem unfair to require that one who deliberately goes perilously close to an area of proscribed conduct shall take the risk that he may cross the line." (internal quotations and citations omitted)).

Further, despite this confusion, there is no evidence that PNC confirmed the status of the Davises' mortgage prior to sending the letters. *Compare Chavis*, 264 A.3d at 1274 (explaining that "[a defendant's] mere assertion after the fact that it acted in good faith should not suffice at the summary judgment stage to overcome an inference that it acted recklessly by claiming a right in circumstances where a reasonably competent [defendant] would have determined that the right did not exist") *with Mitchell v. Brock & Scott, PLLC*, Civ. No. 19-02225-LKG, 2022 WL 3290710, at *8 (D. Md. Aug. 11, 2022) (granting summary judgment in favor of defendant where it was undisputed that the defendant "exercised due diligence in determining the status of the Mortgage Loan before sending these letters to plaintiff" and where it was "undisputed that [defendant] performed an extensive review of the Mortgage Loan and the records from the loan's prior loan servicers in 2018, to ensure that the Mortgage Loan was valid"). In addition, the Termination Letter included the entirely false statement that "[a]fter being offered a Trial Period Plan or Home Affordable Modification[,] you notified us on December 22, 2015 that you did not wish to accept the offer." (PNC Trial Ex. 20.) Accordingly, PNC's actions were—at a minimum—reckless, and PNC violated the MCDCA.

### D. Emotional Distress Damages

PNC's fourth objection is: "Since the record contains no evidence that either ties PNC's conduct to emotional distress experienced by the Davises or substantiates any emotional distress beyond the Davises' conclusory testimony, should the district court conclude that the Davises

failed to establish a basis for recoverable emotional distress damages?" (PNC Br. at 3.) In particular, PNC argues that "[n]one of the Davises' testimony connects their distress to the purported basis for the statutory claims, nor are the Davises' damages supported by anything more than conclusory statements about upsetting circumstances over several years." (PNC Br. at 46.)

The MCDCA provides that "[a] collector who violates any provision of this subtitle is liable for any damages proximately caused by the violation, including damages for emotional distress or mental anguish suffered with or without accompanying physical injury." Md. Code Ann., Com. Law § 14-203. Under Maryland law, "proximate cause exists where there is a complete continuance and unbroken sequence between the act complained of and the act finally resulting in the injury, so that one may be regarded by persons of ordinary judgment as the logical and probable cause." *Scott v. Montgomery Cnty. Bd. of Educ.*, 120 F.3d 262 (4th Cir. 1997) (internal quotations and alterations omitted).

Courts have found that various symptoms of emotional distress, including "anxiety, sleeplessness, nervousness, and frustration" may be proximately caused by a violation of the MCDCA. *Puryear v. Capital One Bank, N.A.*, Civ. No. RDB-12-3222, 2014 WL 103506, *4 (D. Md. Jan.10, 2014); *see also Peckey v. Bank of Am., N.A.*, Civ. No. RDB-14-433, 2015 WL 1622967, at *6 (D. Md. Apr. 10, 2015) (denying motion to dismiss where plaintiff "s[ought] damages for the emotional distress and mental anguish suffered as a result of the alleged MCDCA violation" and alleged that he "suffered from mental anguish, which manifested physically through hair loss, migraines, and sleep loss" and "suffer[ed] from depression, and extreme anxiety"). Further, a plaintiff may recover for the worsening of an existing condition. *See Harris v. Jones*, 380 A.2d 611, 616 n.2 (Md. 1977) ("The fact that [a plaintiff] may have had some pre-existing susceptibility to emotional distress does not necessarily preclude liability if it can be shown that

27

the conduct intensified the pre-existing condition of psychological stress."); *Puryear*, 2014 WL 103506, at *5 ("Contrary to the position taken by [defendant], the evidence that the [p]laintiff suffered from some degree of emotional stress before the debt collection efforts does not completely foreclose his ability to show that those debt collection efforts also caused injury.").

However, "not only is emotional distress fraught with vagueness and speculation, it is easily susceptible to fictitious and trivial claims." *Sloane v. Equifax Info. Servs., LLC*, 510 F.3d 495, 503 (4th Cir. 2007) (internal quotations and citation omitted). Therefore,

> [A]lthough specifically recognizing that a plaintiff's testimony can provide sufficient evidence to support an emotional distress award, we have required a plaintiff to reasonably and sufficiently explain the circumstances of the injury and not resort to mere conclusory statements. . . . Thus, we have distinguished between plaintiff testimony that amounts only to conclusory statements and plaintiff testimony that sufficiently articulates true demonstrable emotional distress.

*Id.* (internal quotations, citations, and alterations omitted). To determine whether an emotional distress damages award is excessive, courts examine:

> The factual context in which the emotional distress arose; evidence corroborating the testimony of the plaintiff; the nexus between the conduct of the defendant and the emotional distress; the degree of such mental distress; mitigating circumstances, if any; physical injuries suffered due to the emotional distress; medical attention resulting from the emotional duress; psychiatric or psychological treatment; and the loss of income, if any.

*Id.* (citation omitted).

Here, upon a *de novo* review of the record, including the Davises' testimony, the Court finds that emotional distress damages are warranted. As noted above, the Court has found that both the Termination Letter and the March 2016 communications constituted violations of the MCDCA. The Davises' testimony credibly reflects that they suffered emotional distress after PNC unlawfully revoked the Modification Agreement. (*See* July 29, 2019 Trial Tr. at 68 (Teresa Davis explaining that "panic ensued" once PNC purported to revoke the Modification Agreement).) In

28

addition, PNC's own records reflect that Teresa Davis was upset by this revocation. (*See* PNC Ex. 23 at DX023-018 (reflecting a phone call on December 31, 2015 explaining that "Mrs. [Davis] was upset hung up during closing call").[12]

The Court concludes that an award of $50,000 is appropriate. This award is commensurate with emotional distress damages awarded in other consumer protection cases. *See, e.g., Sloane v. Equifax Info. Servs., LLC*, 510 F.3d 495, 505 (4th Cir. 2007) ("A survey of the other, more recent [Fair Credit Reporting Act] cases that involve requests for remittitur of emotional distress awards suggests that approved awards more typically range between $20,000 and $75,000.").

The Court appreciates that the Davises' testimony did not always neatly differentiate harm suffered at various points during the process. However, the Court does not include in its award any emotional distress the Davises suffered prior to the Termination Letter, and takes such prior emotional distress into consideration only to the extent that it is helpful to establish the factual context within which the emotional distress occurred. Further, under Maryland law, "if the fact of damage is proven with certainty, the extent or the amount thereof may be left to reasonable inference." *Thomas v. Cap. Med. Mgmt. Assocs., LLC*, 985 A.2d 51, 66 (Md. Ct. Spec. App. 2009) (quoting *David Sloane, Inc. v. Stanley G. House & Assocs., Inc.*, 532 A.2d 694 (Md. 1987)).

### E. MCPA

PNC's fifth objection is: "Since the record indicates that PNC should prevail on the

---

[12]    Further, the Court is puzzled by PNC's assertion that "by March of 2016 the Davises had known for several weeks that the Modification was no longer available. It therefore makes no logical sense that a routine monthly statement could have somehow triggered a severe emotional reaction." (PNC Br. at 46.) The two March 2016 documents—which confusingly reflected different past due amounts—indicated that the Davises owed PNC tens of thousands of dollars. The March 2016 statement indicated that the Davises owed $48,353.03 in past due payments and that the total amount due was $51,372.40. (Davis Trial Ex. 8.) The letter explained that the Davises were $48,353.30 delinquent on their mortgage and that "[f]ailure to bring your loan current may result in fees and foreclosure – the loss of your home." (Davis Trial Ex. 9.) It further stated that "[f]irst legal foreclosure action has been taken." (*Id.*) These are hardly routine monthly statements.

MCDCA claim, and since the record contains no evidence that the Davises sustained a compensable injury proximately caused by a prohibited trade practice of PNC, should the district court conclude that the Davises failed to establish a violation of the MCPA?" (PNC Br. at 3.)

As previously discussed, upon a *de novo* review of the record and the law, the Court has concluded that PNC violated the MCDCA. PNC has therefore also violated the MCPA. *See Olson v. Midland Funding, LLC*, 578 F. App'x 248, 251 (4th Cir. 2014) (citing Md. Code Ann., Com. Law § 13–301(14)(iii)) ("A violation of the MCDCA is a per se violation of the MCPA.").

### F. Fee Award

PNC's sixth objection is: "Since the record contains neither legal nor factual support for an award to the Davises of attorneys' fees and costs, should the district court conclude that the Davises failed to establish a basis for a fee award?" (PNC Br. at 3.) In addition to objecting to a fee award on the basis that the Davises have not established a violation of the MCPA, PNC argues that the recommended award of $302,472.67 is excessive. (PNC Br. at 50.) PNC argues that the Davises should only be awarded a maximum of the amount the Davises purportedly paid under their fee arrangement with their attorneys.[13] (PNC Br. at 50 n.20, 51.) PNC further argues that

---

[13]   As is relevant here, the Davises' attorneys had initially filed a compensation disclosure indicating that: "For legal services, we have agreed to accept: 40% contingency fee agreement of total gross award plus any monies held in escrow, if permitted by the court." *In re Davis*, Bankr. No. 16-15555, ECF No. 149 (May 4, 2021). The Court shares PNC's concerns regarding this fee disclosure that suggested that the attorneys were intending to claim as attorneys' fees funds held in escrow, given that these amounts clearly appear to be held for the purposes of paying any arrearages. (*See* July 29, 2019 Trial Tr. 78:1–9 (Teresa Davis explaining that she was making mortgage payments into an escrow account with her attorneys).) The Court also shares PNC's concerns regarding the lack of clarity surrounding the fee agreement between the Davises and their attorneys.

However, the filing was ultimately supplanted on May 6, 2021 by a compensation disclosure that indicates that: "For legal services, we have agreed to accept: Any fees awarded by the Court for successful prosecution of the Maryland Consumer Protection Act Count." *In re Davis*, Bankr. No. 16-15555, ECF No. 151 (May 6, 2021). The "Balance Due" is listed as: "Limited to attorneys' fees and expenses, if any, awarded by the Court pursuant to Plaintiffs' Fee Application for the successful prosecution of the Maryland Consumer Protection Act." *Id.* At a hearing regarding the fees, "the attorneys for the Davises clarified the meaning of this language and confirmed on the record that they agreed to limit their fee to the amount to be awarded by the Court pursuant to § 13-408(b) of the MCPA." (ECF No. 3-30 at 3 n.6.)

Thus, the Court's analysis here is based on the operative compensation disclosure (the May 6, 2021 disclosure) and the Davises' attorneys' representations to the Bankruptcy Court. In other words, the Court's analysis

the fee award must be limited to only those fees incurred in litigating the MCPA claim. (*Id.* at 51–53.)

The Court finds that an award of fees is warranted. However, the Court finds that the reasonable amount of such fees is $57,644.44 for the Law Office of Mary A Jordan ("MAJ") and $75,127.74 for the Kurland Law Group ("KLG") as well as expenses of $1,453.12 to MAJ and $347.52 to KLG for a total of $134,572.82.

### 1.   *Factual Background Regarding Attorneys' Fees*

There has been significant briefing and discussion regarding the nature of the Davises' fee arrangement with their attorneys, Sari Kurland and Marie-Claire Noukelak of KLG and Mary Migues-Jordan of MAJ. As is relevant here, the Davises' attorneys initially filed a Motion for Allowance of Compensation and Reimbursement with the Bankruptcy Court, to which they attached detailed billing records, seeking $387,067.66 ($380,928.82 in fees and $6,138.84 in expenses). (ECF Nos. 3-9–3-12.) PNC opposed the Motion, arguing that it did not distinguish between compensable and non-compensable claims, that it failed to apply guidelines from this District's Local Rules, and that the lodestar factors weighed in favor of a substantial decrease in the fee award. (ECF No. 3-13.) The Davises filed a response, amending the amount they were seeking in attorneys' fees and expenses. (ECF Nos. 3-22–3-25.) The Davises' attorneys sought a total of $302,472.67 ($298,946.39 in fees and $3,526.28 in expenses). (*Id.*) This reduction in fees and expenses was due to the Davises' counsel "exercising up front billing judgment, and voluntarily not requesting compensation for over 20% of the actual hours spent on this litigation."[14]

---

here is based on the understanding that the amount held in escrow will not be used to pay attorneys' fees or expenses and that the fee amount awarded herein and in the accompanying Order will constitute the entirety of the Davises' attorneys' fees and expenses.

[14]     As further explained in the Davises' briefing, "[a]s part of the adversary proceeding, in an effort to meet the requirements of allowing fees only for statutory claims with fee-shifting provisions, Migues-Jordan and Kurland estimated that they each spent no more than 20% of their time on bankruptcy, modification, and non-MCDCA/MCPA

(ECF No. 3-23 at 6.)  The $302,472.67 is comprised of the following: $152,032 in attorneys' fees for MAJ ($190,040 in total fees with a twenty percent reduction); $146,914.39 in attorneys' fees for KLG ($190,888.82 in fees with a twenty percent reduction and an additional "no charge" deduction of $7,245.83); and $3,526.28 in expenses.  (ECF Nos. 3-24, 3-25.)  Ultimately, the Bankruptcy Court recommended that judgment be entered against PNC for $302,472.67 in attorneys' fees.  (ECF No. 3-30 at 4.)

This Court concluded that the fee award must be limited to only those fees incurred in litigating the MCPA claim, as described in more detail below, and therefore ordered additional briefing on this issue.  (ECF No. 25.)  In its Order, the Court noted that the Davises had not apportioned the fees between the compensable and non-compensable claims (i.e., between the consumer protection and breach of contract claims) and that there appeared to be other non-compensable items in the billing records, such as entries relating to obtaining a mortgage modification.  (*Id.* at 2–3.)  The Court—recognizing the interplay between the breach of contract and consumer protection claims—noted that the Davises were required to provide a reasonable apportionment of their attorneys' time.  (*Id.* at 4.)

In responding to the Court's Order, the Davises' attorneys did not apportion their time as the Court requested.  (*See generally* ECF No. 26.)  Rather, they argue that the breach of contract and consumer protection claims had a common core of facts and that they therefore did not need to apportion their fees.  (*Id.* at 20–22.)  Further, they represent that they have "reviewed and recalculated without the twenty-percent reduction taken originally, but with the elimination of all work related solely to [ ] obtaining a modification."  (*Id.* at 23.)  Thus, they explain (without

---

related matters, and that the bulk of their legal work was in an effort to prove PNC's violations of the MCDCA and the MCPA."  (ECF No. 29 at 3.)

providing any documentary support other than two vague affidavits) that:

> Mary Migues-Jordan and the Law Office of Mary A Jordan billed time at a reasonable and customary hourly rate totaling $190,040.00, less work not related to the MCDCA and MCPA claims, for a total in fees of $179,970.00 plus expenses of $3,117.55, for a total of $183,087.55 . . . . Sari Kurland and the Kurland Law Group billed time at a reasonable and customary hourly rate totaling $190,888.82, less work not related to the MCDCA and MCPA claims, for a total in fees of $185,667.16 plus expenses of $408.73 for a total of $ 191,297.55.

(ECF No. 26 at 24–25.) Therefore, MAJ and KLG reduced their attorneys fees by $10,070 and $5,221.66,[15] respectively. There is no detail regarding what specific entries were deleted, providing the Court with no basis for assessing these discrete reductions. They are now seeking a much larger amount of fees and expenses: a total of $374,385.10, as opposed to the $302,472.67 proposed by the Bankruptcy Court.

### 2. Fee Award Under the MCPA

The MCPA allows for recovery of attorneys' fees. *See* Md. Code Ann., Com. Law § 13-408(b) ("Any person who brings an action to recover for injury or loss under this section and who is awarded damages may also seek, and the court may award, reasonable attorney's fees."). As discussed above, the Court has found that the Davises have established an MCDCA violation, which is per se an MCPA violation. The Court concludes that an award of reasonable attorneys' fees is appropriate in this case, but that such fee should be apportioned to correlate with the work related to the violations of the MCPA and MCDCA.

Section 13-408(b) is discretionary. *See* Md. Code Ann., Com. Law § 13-408(b) ("Any person who brings an action to recover for injury or loss under this section and who is awarded damages may also seek, and the court may award, reasonable attorney's fees."); *WSC/2005 LLC*

---

[15]     As noted above, the Kurland Law Group previously subtracted $7,245.83 in "Additional No Charge Deductions" from the $190,888.82 figure (in addition to the twenty percent discount). (ECF No. 3-25 at 18.) Here, the Kurland Law Group subtracts only $5,221.66. There is no explanation for this discrepancy, or why it is now appropriate to subtract over $2,000 less.

*v. Trio Ventures Assocs.*, 190 A.3d 255, 270 (Md. 2018). Given that the Davises did not apportion their fees as requested, the Court could determine not to award any attorneys' fees or expenses. *Rochkind v. Stevenson*, 145 A.3d 570, 606 (Md. Ct. Spec. App. 2016) (finding that the trial court did not abuse its discretion where it denied a fee petition in which counsel failed to "segregate the time spent on the [M]CPA claim from the time spent on other claims"), *rev'd on other grounds*, 164 A.3d 254 (Md. 2017). However, the MCPA "is intended to be construed liberally in order to promote its purpose of providing a modicum of protection for the State's consumers." *Wash. Home Remodelers*, 45 A.3d at 219. Thus, Maryland courts have "warned against construing remedial statutes like the [M]CPA with a narrow or grudging process that exemplifies and perpetuates the very evils to be remedied." *Mills*, 223 A.3d at 968 (internal citations, quotations, and alterations omitted). The Court therefore concludes that an award of reasonable attorneys' fees is appropriate in this case.

As the Maryland Court of Appeals has explained, "[t]he fee award is limited to the [M]CPA action and may not be based on additional recoveries under other causes of action." *Hoffman*, 867 A.2d at 304–05; *see also Barnes v. Rosenthal Toyota, Inc.*, 727 A.2d 431, 434 (Md. Ct. Spec. App. 1999) (finding that a fee award was "proper and reasonable" where the record "suggests that the court did in fact apportion its award of counsel fees only to those costs and expenses that appellant incurred in litigating the successful [M]CPA action"). Because the MCPA claim is derivative of the MCDCA claim, the fees incurred in litigating the MCDCA claim would be appropriately awarded as attorneys' fees. *See Ireland v. Riffey*, No. 2264, 2019 WL 1012122, at *3 (Md. Ct. Spec. App. Mar. 4, 2019) (explaining that, where plaintiffs were awarded damages for a "violation of the [MCPA] via the damage awards" for the MCDCA, they were entitled to seek attorneys' fees).

34

Further, courts have acknowledged the difficulty attendant in apportioning fees when a case involves multiple claims. *Mercedes-Benz of N. Am., Inc. v. Garten*, 618 A.2d 233, 243 (Md. Ct. Spec. App. 1993) (declining to find that trial court's award of attorney fees was clearly erroneous when plaintiff failed to present evidence on the amount of time allocated to the MCPA claim but explaining that "[t]here is no doubt that [plaintiff] may recover attorney's fees under § 13-408(b) of the [M]CPA, but not for the breach of an express warranty"). The Court is also mindful that Maryland courts have declined to impose a "requirement of keeping detailed records into the consumer protection arena." *Id.* at 243. The task of apportioning fees is particularly difficult in this case, where the claims were significantly interrelated. Therefore, the Court will not attempt to parse with scientific precision exactly which time entries relate to the breach of contract claim as opposed to the consumer protection claims.

However, as the Court previously explained (ECF No. 25), there are many non-compensable entries in the billing records. By way of example, nearly all of the first twenty entries in the billing records for MAJ reflect discussions regarding obtaining a mortgage modification, not relating to any compensable cause of action. (ECF No. 3-24 at 3–4.) Further, the original Complaint the Davises filed on July 24, 2017 contained no mention of the consumer protection claims (nor even of a breach of contract claim);[16] these claims were only raised in the Amended Complaint, filed on May 31, 2018. (ECF No. 2-15.) It is therefore difficult to see how any entries prior to July 24, 2017 or related to the filing of the original Complaint could be compensable. There are also many entries relating to mediation and, in their briefing, the Davises explain that "Migues-Jordan reviewed her notes taken during mediation and determined that 60% of the work

---

[16]     Rather, the original Complaint raised claims for declaratory and equitable relief to enforce the Modification Agreement. (ECF No. 2-3.)

was related to discussions to obtain a modification; hence, that work was not included in the fee request." (ECF No. 29 at 4 n.2.) Taken together, these entries in the MAJ billing records (i.e., entries prior to July 24, 2017 or related to filing the original Complaint—which also include the 20 first entries—and entries relating to mediation[17]) represent a total of approximately $30,000 in fees. (*See* ECF No. 3-24 (reflecting approximately $24,000 in fees prior to July 24, 2017 and over $5,000 in fees relating to mediation).) Given that MAJ only provided a total of $10,070 subtraction of fees, the Court concludes that the Davises' attorneys did not exercise appropriate billing judgment in its various briefings relating to fees.

Accordingly, the Court has closely scrutinized the timesheets and concludes that the Davises' attorneys should not be compensated for entries reflecting work prior to filing the Amended Complaint (i.e., before May 31, 2018)[18] and that the total fees should be further reduced by one-third to account for non-compensable work. This accounts both for the fact that the Court recognizes that the Davises were required to prove a contract claim to prove their consumer protection claims, but also that there are a significant number of time entries that clearly relate to non-compensable work.

Thus, the Court will reduce the $190,040 in fees claimed by MAJ by $60,340 for work prior to May 31, 2018, and further reduce it by one-third for a total of $86,466.66. The Court will reduce the $190,888.82 in total fees claimed by KLG by $21,851.40 for work prior to May 31, 2018, and further reduce it by one-third, for a total of $112,691.61.

---

[17]     This includes all fee entries with "mediation" in the text.

[18]     Of course, the Court recognizes that the Davises' attorneys engaged in discovery during this period and other work to prepare the Amended Complaint, which does include the relevant claims. However, the Davises did not provide the Court with any other reasonable method of ascertaining which work related to the compensable claims.

### 3.   *Lodestar Analysis*

Further, the Court applies the lodestar approach to a fee request. *See, e.g.*, *Hyundai Motor Am. v. Alley*, 960 A.2d 1257, 1265–66 (Md. Ct. Spec. App. 2008) (applying lodestar methodology to MCPA claim); *Est. of Castruccio v. Castruccio*, 233 A.3d 175, 202 n.25 (Md. Ct. Spec. App. 2020) (explaining that "Maryland appellate courts have held that the lodestar method applies to [several] fee-shifting statutes . . . [including] the Consumer Protection Act"); *Friolo v. Frankel*, 819 A.2d 354, 356 (Md. 2003) ("We shall hold generally that, in actions under fee-shifting statutes . . . the lodestar approach is ordinarily the appropriate one to use in determining a reasonable counsel fee.").[19]   In addition, "a trial court has a significant degree of discretion in determining a reasonable attorney's fee award under a fee-shifting statute such as the [MCPA]." *Frazier v. Castle Ford, Ltd.*, 59 A.3d 1016, 1027–28 (Md. 2013).

The lodestar method "begins by multiplying the reasonable number of hours expended by an attorney by a reasonable hourly rate." *Hyundai Motor Am.*, 960 A.2d at 1265.   However, "the lodestar methodology [is] broader than simply a multiplication of reasonable hours spent by a reasonable hourly rate, but require[s] a careful consideration by the trial court of appropriate adjustments that should be made on a case-by-case basis." *Id.*   "'Hours that [a]re excessive, redundant, or otherwise unnecessary should be excluded, as hours not properly billed to one's

---

[19]      PNC suggests that using the lodestar approach amounts to punitive damages under the guise of attorneys' fees. (PNC Br. at 50 n.21.)  Of course, "[p]unitive damages are not available" under the MCPA. *Frazier v. Castle Ford, Ltd.*, 59 A.3d 1016, 1026 n.20 (Md. 2013).  However, allowing for an award of reasonable attorneys' fees under the lodestar approach does not convert any such award into punitive damages. As Maryland courts have recognized, the lodestar approach is appropriate here, given the public policy purposes of including a fee-shifting provision in a statute. *See, e.g.*, *Castruccio*, 233 A.3d at 202 (explaining that the lodestar approach is appropriate for claims for attorneys' fees under fee-shifting statutes, "which are usually designed to encourage suits that, in the judgment of the legislature, will further public policy goals" and that "[a] court's application of the lodestar method in these cases is designed to reward counsel for undertaking socially beneficial litigation in cases where the expected relief has a small enough monetary value that other methods would provide inadequate compensation") (internal quotations, citations, and alterations omitted); *see also Ouaguem v. Wandji*, No. 749, 2018 WL 3323793, at *4 (Md. Ct. Spec. App. July 6, 2018) (allowing *pro bono* counsel to recover attorneys' fees under §13-408).

client are also not properly billed to the adversary.'" *Id.* (quoting *Friolo v. Frankel*, 819 A.2d 354, 367–68 (Md. 2003)).   Maryland courts examine the following factors in assessing the reasonableness of a fee award request:

> (1) the time and labor required, the novelty of the questions involved, and the skill requisite to perform the legal service properly;
> (2) the likelihood, if apparent to the client, that the acceptance of the particular employment will preclude other employment by the lawyer;
> (3) the fee customarily charged in the locality for similar legal services;
> (4) the amount involved and the results obtained;
> (5) the time limitations imposed by the client or by the circumstances;
> (6) the nature and length of the professional relationship with the client;
> (7) the experience, reputation, and ability of the lawyer performing the services; and
> (8) whether the fee is fixed or contingent.

*Hyundai Motor Am.*, 960 A.2d 1257, 1266; *see also McIntosh v. McLaurin*, Civ. No. DKC 07-2334, 2010 WL 2802167, at *2 (D. Md. July 14, 2010) (applying these factors to an MCPA fee award claim).   Courts need only use these factors to provide guidance as to what constitutes a reasonable fee award, and "do[ ] not need to evaluate each factor separately." *SunTrust Bank v. Goldman*, 29 A.3d 724, 730 (Md. Ct. Spec. App. 2011).

The court then must "weigh the fees requested by the result achieved and decide whether an upward or downward adjustment in the award is warranted." *Id.* (citing *Friolo*, 819 A.2d, 368). "If the court determines that the [party] has obtained excellent results, his attorney should recover the full fee, which would normally encompass all hours reasonably expended on the case." *Id.* However, "if the court determines that the [party] achieved only partial success, a downward adjustment may be necessary." *Id.*

With respect to the time and labor required, the novelty of the questions involved, and the skill requisite to perform the legal service properly, the Court finds that the requested fees are excessive.   The Court does not seek to diminish the importance of vindicating the Davises' rights,

but—at base—this is a relatively simple breach of contract and consumer protection case. For example, the docket reflects that the motions practice was not extensive (ECF No. 2-2), and trial lasted only two days and consisted of the testimony of three witnesses. That the attorneys appear to have spent over 1,000 hours[20] on this case is excessive and warrants a reduction in the fees awarded. *See, e.g., VFI Assocs., LLC v. Lobo Mach. Corp.*, Civ. No. 08-00014, 2012 WL 975705 at *7 (W.D. Va. Mar. 22, 2012) (reducing fee request by half in case where the fraud was straightforward and where there were no significant novel or complex legal issues, despite the fact that discovery in the case was difficult); *Zen42 LLC v. Wash. & Lee Univ.*, Civ. No. 17-00053, 2018 WL 4625627, at *3 (W.D. Va. Sept. 26, 2018) (reducing hours by 65 percent based on unreasonable overbilling in straightforward breach-of-contract case).

These excessive fees are due at least in part to the engagement of two law firms to handle this case. While the Court appreciates that a small law firm may not have the resources to handle such a case on its own, the Davises' attorneys' billing records reflect extensive redundant time entries. For instance, the Davises' attorneys billed for multiple lawyers' attendance at depositions, hearings, and trial. (*See, e.g.*, ECF Nos. 3-24, 3-25 (June 13, 2018 entries reflecting that two attorneys attended the depositions of Teresa and Christopher Davis; June 14, 2018 entries reflecting that all three attorneys attended the deposition of Dorothy Thomas; October 18, 2018 entries reflecting that all three attorneys attended the hearing relating to the motion for summary judgment;[21] July 2019 entries reflecting that all three attorneys billed extensively for trial preparation and attended trial).) These redundant billing entries—which do not provide the Court

---

[20]     This represents 386 associate hours and 153 principal hours from KLG and 508 hours from MAJ. (ECF Nos. 3-25 at 18; ECF No. 3-24 at 24.)

[21]     The Court recognizes that the bills appear to provide a discount for half of one attorney's time on this date. This small deduction is not adequate to rectify the redundant billing.

with a basis for finding that each lawyer fulfilled a different role in the trial preparation and during the course of trial—likewise warrant a reduction in the fee award.

Moreover, beyond the redundancy, the time entries are also often vague or block-billed. This also warrants a reduction. *Spell v. McDaniel*, 852 F.2d 762, 768 (4th Cir. 1988) ("Because the burden is on the party seeking the fee award to establish the reasonableness of the hours spent . . . where it is necessary for the court to approximate because of counsel's inadequate record-keeping we consider it just so to do in favor of the party contesting the fee award." (citing *Hensley v. Eckerhart*, 461 U.S. 424, 437 (1983))); *Thompson v. U.S. Dep't of Hous. & Urb. Dev.*, Civ. No. MGJ-95309, 2001 WL 1636517, at *13 (D. Md. Dec. 12, 2001) ("[W]here litigants have submitted fee applications that are too vague to permit the district court to determine whether the hours claimed reasonably were spent, the petitioner runs the risk that the fees sought will be reduced by the court."); *see also Christian v. Maternal-Fetal Med. Assocs. of Maryland, LLC*, 183 A.3d 762, 779 (Md. 2018) ("The party seeking an award of attorney's fees bears the burden of demonstrating the reasonableness of the attorney's fees sought."). For instance, both law firms have vague "trial prep" entries that provide no explanation to the Court as to what trial preparation occurred or why three lawyers were required to engage in such preparation. (*See, e.g.*, ECF No. 3-24 (reflecting a 10.20 hour entry totaling $4,080 for "Review Material - Trial Prep"); ECF No. 3-25 (reflecting an 8.0 hour entry totaling $3,200 for "Trial Preparation").) This type of entry is not adequate to allow the Court to determine the reasonableness of the fees. *See Scott v. Clarke*, Civ. No. 12-00036, 2020 WL 2771949, at *7 (W.D. Va. May 28, 2020) (explaining that "[t]here is little for the Court to go on when thirteen billable hours are sought for 'trial prep,' or 8.5 hours for 'trial prep,' or 6.5 hours for 'trial prep'" and granting a reduction of 20 percent for this and other issues); *Skapinetz v. CoesterVMS.Com, Inc.*, Civ. No. 17-1098-PX, 2021 WL 1634712, at *10 (D. Md. Apr. 27, 2021)

("Other records are vague or 'block billed,' which complicates ascertaining the reasonableness of counsel's efforts.").

The Court has also considered the amount at issue and the results obtained. The Davises have largely succeeded on their claims, with the exception of certain relief and damages, and have obtained monetary damages of $50,000. This, in combination with the conclusion that the Davises should be permitted to reinstate their mortgage on the terms of the Modification Agreement, reflect good results for the Davises.

Certain of the lodestar factors are not particularly relevant here or do not change the Court's analysis with respect to the reasonableness of the fees, such as the likelihood that the acceptance of the particular employment will preclude other employment by the lawyer[22]; the fee customarily charged[23]; the time limitations imposed by the client or the circumstances; the nature and length of the professional relationship with the client; the experience, reputation, and ability of the lawyer performing the services[24]; and whether the fee is fixed or contingent.[25]

Accordingly, in consideration of the lodestar factors and the above discussion, the Court finds that it is necessary to impose a further one-third reduction to identify the reasonable amount of fees. Therefore, the reasonable fees are $57,644.44 for MAJ and $75,127.74 for KLG.

In addition, the Court must assess whether an upward or downward departure is necessary given the level of success the attorneys obtained. Here, the Davises were largely successful on their claims, even if the Court did not award the magnitude of damages sought. Accordingly, the

---

[22]     While the Court credits the Davises' attorneys' assertion that this case precluded other work, this fact does not impact the Court's analysis regarding the reasonableness of the fees requested.

[23]     The Davises' attorneys' fees are in line with those provided in Appendix B of the Court's Local Rules.

[24]     Although the Court recognizes the experience of the attorneys in this matter, that the case was a relatively simple one militates in favor of a reduced award.

[25]     As discussed above, the Davises' attorneys have agreed to limit their fees to that which the Court awards.

Court finds that no further adjustment is necessary.

### 4.   *Expenses*

The Court will also award expenses in line with the above analysis. Accordingly, any expenses incurred prior to May 31, 2018 will not be awarded and those expenses incurred after May 31, 2018 will be reduced by one-third. The Davises did not provide the Court with updated billing records and, thus, the Court begins with the expenses outlined in the billing records presented to the Bankruptcy Court, which were $3,004.99 for MAJ and $521.29 for KLG. (ECF Nos. 3-24, 3-25.) The Court will award the following expenses: $1,453.12 to MAJ and $347.52 to KLG.

### *IV.*   *Conclusion*

For the foregoing reasons, the Court adopts the Bankruptcy Court's Proposed Findings of Fact and Conclusions of Law with respect to its finding that PNC is liable for breach of contract and violations of the MCDCA and MCPA, as well as with respect to the amount of emotional distress damages ($50,000). However, the Court does not adopt the Bankruptcy Court's Proposed Findings with respect to contract damages. Further, while the Court finds that an award of attorneys' fees and expenses is appropriate, the reasonable amount of such fees is $57,644.44 for MAJ and $75,127.74 for KLG as well as expenses of $1,453.12 to MAJ and $347.52 to KLG for a total of $134,572.82. Judgment will be entered accordingly.

DATED this 29 day of September, 2022.

BY THE COURT:

James K. Bredar
Chief Judge